a

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

JEFFREY WAYNE ROSS #159220,          CIVIL DOCKET NO. 1:22-CV-01290
Plaintiff                                              SEC P

VERSUS                                      JUDGE TERRY A. DOUGHTY

E DUSTIN BICKHAM,               MAGISTRATE JUDGE PEREZ-MONTES
Defendants

## REPORT AND RECOMMENDATION

Before the Court is a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 filed by pro se Petitioner Jeffery Wayne Ross ("Ross"). Ross is an inmate in the custody of the Louisiana Department of Corrections, incarcerated at the Dixon Correctional Center in Jackson, Louisiana. Ross challenges his conviction and sentence imposed in the Ninth Judicial District Court, Rapides Parish.

Because Ross cannot establish his right to habeas relief under § 2254, the Petition (ECF No. 1) should be DENIED and DISMISSED WITH PREJUDICE.

I.   Background

On September 19, 2017, the defendant, Jeffery Wayne Ross, and the victim, Billy Gillette, had a confrontation regarding an incident on Highway 167 in Grant Parish. The confrontation culminated in the defendant running the victim over with his Mercedes Benz SUV and dragging him several yards. Believing the defendant was backing up to run over him again, the victim began shooting at the defendant's car. The victim survived the incident and was taken to the hospital where he subsequently underwent surgery for his injuries.

On October 13, 2017, the defendant was charged by bill of information with one count of attempted second degree murder, a violation of

1

La.R.S. 14:27 and 14:30.1, and one count of aggravated battery, a violation of La.R.S. 14:34(A). After a three-day trial that concluded on February 22, 2018, a unanimous jury found the defendant guilty as charged on both counts. On March 26, 2018, the defendant filed a Motion for New Trial and a Motion for Post Verdict Judgment of Acquittal. Both motions were denied by the trial court on that same date without a hearing.

Subsequently, on March 29, 2018, the trial court sentenced the defendant for attempted second degree murder to fifteen years at hard labor, without benefit of probation, parole, or suspension of sentence, and for aggravated battery to ten years at hard labor, to run concurrently with the sentence imposed for attempted second degree murder. The trial court also ordered the defendant to pay a $ 5,000.00 fine, court costs, and $ 75,000.00 in restitution to the victim. On April 11, 2018, the defendant filed a motion to reconsider sentence, which was denied by the trial court on that same date without a hearing.

*State v. Ross*, 2018-453, p. 1 (La.App. 3 Cir. 3/13/19); 269 So.3d 1052, 1055, *writ denied*, 2019-00581 (La. 1/22/20); 291 So.3d 1041.

Ross appealed alleging: (1) insufficient evidence of attempted second-degree murder under *Jackson v. Virginia*, 443 U.S. 307 (1979); (2) incorrect and improper jury instruction; (3) improper denial of a Motion for New Trial; (4) violation of the Double Jeopardy Clause; (5) excessive sentences; and (6) improper order of restitution. The appellate court affirmed the conviction and sentence for attempted second-degree murder, but vacated the conviction and sentence for aggravated battery and the order of restitution. *Id.* at 1083. The Louisiana Supreme Court affirmed. *State v. Ross*, 2019-00581 (La. 1/22/20); 291 So.3d 1041.

Ross filed an application for post-conviction relief raising ineffective assistance of counsel claims. The application was denied, as were Ross's requests for further review. *See Louisiana v. Ross*, 2020-00236 (La.App. 3 Cir. 9/1/21), *writ denied sub nom. State v. Ross*, 2021-01518 (La. 4/12/22); 336 So.3d 77.

II.   <u>Law and Analysis</u>

A.   <u>Rule 8(a) Resolution</u>

The Court can resolve Ross's § 2254 Petition without the necessity of an evidentiary hearing because there are no genuine issues of material fact relevant to his claims, and the state court records provide an adequate factual basis. *See Moya v. Estelle*, 696 F.2d 329, 332-33 (5th Cir. 1983); *Easter v. Estelle*, 609 F.2d 756, 761 (5th Cir. 1980); Rules Governing Section 2254 Cases.

B.   <u>Standard of Review</u>

An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall be considered only on the ground that he is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). The role of a federal court is to guard against extreme malfunctions in the state criminal justice systems, not to apply de novo review of factual findings or to substitute its own opinions for the determinations of the trial judge. *See Davis v. Ayala*, 576 U.S. 257, 276 (2015) (citing *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011)).

Under § 2254 and the AEDPA, habeas relief is not available to a state prisoner with respect to a claim that was adjudicated on the merits in state court unless the adjudication of the claim: (1) resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding.  *See Martin v. Cain*, 246 F.3d 471, 475-76 (5th Cir. 2001), *cert. den.*, 534 U.S. 885 (2001).

A state court decision is "contrary to" clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases, or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court, but arrives at a result different from Supreme Court precedent.  A state court decision falls within the "unreasonable application" clause when it unreasonably applies Supreme Court precedent to the facts.  *See Martin*, 246 F.3d at 476; *see also Rivera v. Quarterman*, 505 F.3d 349, 356 (5th Cir. 2007), *cert. den.*, 555 U.S. 827 (2008).

On habeas review, a federal court should ask whether the state court's application of clearly established federal law was objectively reasonable.  A federal court cannot grant habeas relief simply by concluding that the state court decision applied clearly established federal law erroneously; the court must conclude that such application was also unreasonable.  *See Martin*, 246 F.3d at 476.  An unreasonable application is different from an incorrect one.  *See Bell v. Cone*, 535 U.S. 685, 694 (2002).  When a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable.  *See Mitchell v. Esparza*, 540 U.S. 12, 18 (2003); *see also Davis*, 135 S. Ct. at 2199 (citing *Fry v. Pliler*, 551 U.S. 112, 119 (2007)).

C.    <u>The evidence was sufficient to convict.</u>

Ross asserts that the evidence was insufficient to prove all the elements of attempted second-degree murder.  Specifically, he alleges a lack of evidence that he had specific intent to kill the victim and that the evidence proved his actions were justified under the circumstances.

The legal standard for presenting this claim in a federal habeas proceeding is extraordinarily high.  As the Supreme Court has explained:

> An appellate court's reversal for insufficiency of the evidence is in effect a determination that the government's case against the defendant was so lacking that the trial court should have entered a judgment of acquittal. Because reversal for insufficiency of the evidence is equivalent to a judgment of acquittal, such a reversal bars a retrial. To make the analogy complete between a reversal for insufficiency of the evidence and the trial court's granting a judgment of acquittal, a reviewing court must consider all of the evidence admitted by the trial court, regardless of whether that evidence was admitted erroneously.

*McDaniel v. Brown*, 558 U.S. 120, 131 (2010) (per curiam) (quotations omitted).

Moreover, the court must apply this standard of review through the doubly deferential lens of the re-litigation bar found in 28 U.S.C. § 2254(d)(1).  That is, the state court decision may not be overturned on federal habeas review unless the decision was an objectively unreasonable application of the deferential standard of *Jackson v. Virginia*, 443 U.S. 307 (1979).  *See Parker v. Matthews*, 567 U.S. 37, 43; *Harrell v. Cain*, 595 F. App'x 439 (5th Cir. 2015).  The *Jackson* inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit."  *Herrera v. Collins*, 506 U.S. 390, 402 (1993).

The habeas court may not substitute its interpretation of the evidence or assessment of credibility for that of the factfinder. *Weeks v. Scott*, 55 F.3d 1059, 1062 (5th Cir. 1995). All credibility determinations and conflicting inferences are to be resolved in favor of the verdict. *See Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005), *cert. denied*, 546 U.S. 831 (2005).

The Louisiana Third Circuit Court of Appeal analyzed Ross's insufficient evidence claim under *Jackson*:

> La.R.S. 14:30.1 provides, in relevant part, that "[s]econd degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm[.]" Further, attempt is defined in La.R.S. 14:27(A), which provides that:
>
>> Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
>
> Thus, although La.R.S. 14:30.1 provides that second degree murder requires "specific intent to kill" *or* "to inflict great bodily harm," in order to be convicted of attempted second degree murder, the State must prove that the defendant had the specific intent to kill. *State [v.] Thomas*, 10-269 (La.App. 3 Cir. 10/6/10), 48 So.3d 1210, *writ denied*, 10-2527 (La. 4/1/11), 60 So.3d 1248, *cert. denied*, 565 U.S. 859, 132 S.Ct. 196, 181 L.Ed.2d 102 (2011). However, that intent may be inferred from the specific circumstances of the offense and the defendant's conduct. *Id.*

*Ross,* 269 So.3d at 1071-72 (citing *State v. Richardson*, 16-107, p. 6 (La.App. 3 Cir. 12/28/16), 210 So.3d 340, 347). The court determined that the jury was not unreasonable in inferring that Ross specifically intended to kill the victim based on the testimony of the witnesses.

The first witness to testify for the state was Wildlife and Fisheries Officer James Bruce.  On the day of the offense, Officer Bruce responded to a call regarding a white male shooting at oncoming vehicles.  *Ross*, 210 So.3d at 1056; ECF No. 10-2 at 24.  Less than five minutes later, Officer Bruce reached the scene, where he saw a white male lying in the roadway.  *Id.*  Several bystanders and a white sedan were parked in the intersection.  *Id.* at 24-25.  When Officer Bruce asked about a weapon, he was told a firearm had been given to a Creola Police Officer.  *Id.* at 27.

Officer Bruce identified several photographs taken of the scene. In one photograph, Officer Bruce identified what he believed was Ross's vehicle with the back glass shattered and an apparent bullet hole on the left side of the glass.  ECF No. 1-2 at 29-30.  In another photograph, Officer Bruce noticed fresh tire marks through the median just north of glass located on the ground.  *Id.* at 32.Ross was not at the scene when Officer Bruce first arrived, but Ross approached the officers at some point, driving down the median.  ECF No. 1-2 at 35.

The next witness to testify was Detective Ryan James of the Grant Parish Sheriff's Office. Detective James arrived at the scene about twenty minutes after receiving the call.  ECF No. 10-2 at 43-44.  Detective James was informed by another officer that Mr. Ross's vehicle ran over Mr. Gillette and dragged him out into the roadway.  *Id.* at 48.

Detective James determined the damage to the glass on the back of Ross's car was caused by bullets.  Detective James identified an area on the glass of the "passenger's side rear" where a bullet entered the vehicle.  *Id.* at 56.  Detective

James identified another bullet hole in the roof of the Ross's vehicle. In the detective's opinion, the bullet hole in the roof was caused by the same bullet that went through the rear headrest and deflected off the driver's headrest. *Id.* at 57.

Detective James also identified photographs taken of the victim while at the hospital. In one photograph, Detective James identified injuries to the victim's leg, and in another photograph, the detective identified injuries the victim suffered from being thrown into the windshield. *Id.* at 71. According to Detective James, the victim's right leg was broken in two places. *Id.* at 72. Detective James testified that the victim was in a lot of pain. Based on statements from witnesses and his interview of the victim, Detective James made the determination to charge Ross with a crime.

When asked on cross-examination if Ross had a gun in his vehicle, Detective James responded, "Not that I'm aware of." ECF No. 10-2 at 76. Detective James testified that a knife was recovered from Mr. Gillette. *Id.* at 76-77. The detective described the knife as having a long shank with a handle and stated that it is primarily used for self-defense. According to Detective James, the firearm used during the incident at issue was also Mr. Gillette's. *Id.*

The next witness to testify, Byron Thomas, gave a voluntary statement about the incident in question. ECF No. 10-2 at 87. Thomas remembered that it was evening when he was traveling south on Highway 167 near Pineville and noticed a Mercedes SUV passing him and slowing down several times. ECF No. 10-2 at 92. According to Mr. Thomas, the SUV was not aggressive. *Id.* at 90. Mr. Thomas

noticed the same SUV pulled over in relation to the incident in question. When asked to describe what he saw regarding the incident in question, Mr. Thomas testified:

A.    Well uh, I wasn't paying attention to him because he was behind me, but I noticed uh, I guess I had done went around him again…

Q.    Okay.

A.    … and uh, got ahead of him, but I noticed there was uh, somebody in the - - the faster lane and they we - - I noticed they were slowing down and I guess they were trying to turn, I don't know why they were slowing down, but they had started slowing down, so I did look for the Mercedes and I noticed he was coming up on me very fastly.

Q.    Okay.

A.    Uh, when he got to where he thought he was going to get in front of me, I never changed speeds, like I said I had my cruise control set, and uh, he had to slam on his brakes pretty hard to keep from rear ending this truck because he was trying to get between us but he ran out of slack.

Q.    Okay.

A.    And I did notice - - as soon as I went past the truck that was trying to turn, uh, the Mercedes got behind me very fast, he darted over and then he darted back in front of the uh, the other SUV and come to a screeching halt.

      . . . .

Q.    Okay, now you said trying to make the turn, uh, did you have a chance to watch that vehicle?

A.    Uh, I did not, like I said, uh, we were - - they were slowing down, and everything that I seen past that was kind of in rear view, so I can't be positive about what I seen. Uh, I did watch the S - - the Mercedes change lanes very fastly and then change lanes again very fastly, and the last thing I seen were both vehicles, had both came to a complete stop.

Q.    So he changed lanes behind you, is that co - - is that accurate?

A.    Yes.

Q.    All right.

A.    He was in the left lane and when I passed this vehicle, he changed lanes very fast, got behind me and then changed lanes again very fastly, and then he stopped and the, I guess in the middle of the road.

Q.    Okay.

A.    By this time, they were pretty much in this intersection.

Q.    Okay, you described you saw him - - the - - the Mercedes coming up really fast in your rear view - - at the time you noticed the other SUV?

A.    Yes, sir.

Q.    Um, did - - were they in the same lane when you noticed that?

A.    They were in the left lane.

Q.    Left lane?

A.    Yes, sir.

. . . .

A.    ... but last thing I seen was both the vehicles were completely stopped.

ECF No. 93-96. According to Mr. Thomas, the other vehicle was behind Ross when Ross came to a complete stop. Mr. Thomas returned to the same area about twenty to thirty minutes later and stopped to offer a statement. *Id.*

On cross-examination, Mr. Thomas explained that the Mercedes stopped in front of the Nissan, forcing the Nissan to stop. ECF No. 10-2 at 99. On re-direct, Mr. Thomas further explained that his vantage point was through his rearview mirror, but he could tell that the Mercedes had gotten in front of the Nissan. *Id.* When asked on re-cross if the Nissan had already stopped before the Mercedes got in front of it, Mr. Thomas replied, "I have no idea. That - - that was while I was passing them and that was rear view, I - - I can't tell you what happened right there exactly." *Id.* at 101.

The next witness, Courtney Perrine, was traveling southbound on Highway 167 with her mother, who was driving, and Ms. Perrine's boyfriend, Willis White. ECF No. 10-2 at 112-13. Ms. Perrine noticed two cars that appeared to be stopped in the median. As Ms. Perrine got closer, she saw one man standing in front of the

other vehicle with both arms stretched out.  Ms. Perrine described the events that

ensued as follows:

A.    As - - as we were still driving, we got actually directly across to the intersection, and the vehicle the man was standing in front of, um, backed up a little bit and then slammed into drive and ran him over.

Q.    Okay, uh, at the time you could see that, could you - - literally see the man that was standing outside of the vehicle and you - - you said he had his hands uh, outstretched in some way at first, did he appear to be talking to the person in the - - in the vehicle or could you tell?

A.    It - - it appeared that he was.

Q.    Okay, did he appear to be upset that you could tell?

A.    No, no, sir.

Q.    Okay, could you tell uh, were you able to see him clearly from your vantage point?

A.    Uh-huh (affirmative response).

When asked if she noticed anything in the man's outstretched hands, Ms.

Perrine replied:

A.    No, sir, his hands were empty.

Q.    And - - are you sure of that?

A.    I'm positive.

Q.    Okay, and - - if he would have anything in his hands, would you have been in a position to see that?

A.    Yes, sir.

Q.    Okay, can you tell me approximately what kind of distance uh, if - - if you know, from the first time you saw the man with his hands out til the time you saw run [sic] over, what kind of distance are we talking about?

A.    Maybe ten (10) yards.

*Id.* at 116.

According to Ms. Perrine, the man appeared to be "drug under the vehicle"

after he was hit.  *Id.*  The vehicle then drove forward and immediately stopped.  Ms.

Perrine then saw the vehicle's "reverse lights kick on" and saw the vehicle back up a

11

"little bit." *Id.* at 119. Ms. Perrine indicated that the person driving the vehicle realized that people were stopping and decided to drive forward. *Id.*

Ms. Perrine further testified that she heard gunshots after she saw the reverse lights come on. *Id.* According to Ms. Perrine, the man in the vehicle immediately drove forward, cut through the median, drove about a foot on the road, and then veered back into the median and stopped. *Id.* at 120.

When asked if she ever saw the pedestrian try to gain entry into Ross's vehicle, Ms. Perrine responded, "No, sir." *Id.* Ms. Perrine could see that the pedestrian was armed with a knife in a sheath on his side. Although Ms. Perrine stated she could not see any other weapon on the pedestrian, she stated that she would have been able to see a gun in the pedestrian's hands. *Id.*

Ms. Perrine pointed to Ross as the driver of the vehicle that ran over Mr. Gillette. *Id.* at 123-24. Ms. Perrine was standing on the side of the road calling the sheriff's department when she heard gunshots. *Id.*

On cross-examination, Ms. Perrine testified that she was about "a quarter a mile" behind the vehicles when she first saw the incident. *Id.* at 125. When she got a little closer, she saw the pedestrian standing outside the vehicle. Ms. Perrine explained that the pedestrian was standing in front of Ross's vehicle and "had both arms stretched to his side, kind of like, what are you doing?" *Id.* at 125.

Ms. Perrine acknowledged that she could have missed something when she looked down at the floorboard to get her phone. *Id.* at 127. Finally, Ms. Perrine

admitted she said nothing in her written statement about seeing Mr. Gillette's hands. *Id.*

On re-direct, the following colloquy took place:

Q.   Okay. If I were to tell you that - - that uh, that - - that Mr. Beck's allegation is, is that at the time the pedestrian was struck with the car, that he had a gun drawn and he was pointing it at the vehicle, were you in a position to clearly see whether or not that was the case?
A.   Yes, sir.
Q.   Okay, did you see uh, a gun drawn at any time, from the time you observed the - - the pedestrian standing outside the vehicle, from the time you stopped and saw him, after he had been run over, and hear the gun shots?
A.   No, sir.
Q.   Okay, and you're sure of that?
A.   Yes, sir.

Ms. Perrine's mother, Tamatha Desadier, testified next for the state. As Ms. Desadier approached the scene, she saw the "younger of the two gentlemen" outside of "the vehicle." ECF No. 10-2 at 131. According to Ms. Desadier, the younger man had his hands up, and she could tell they were arguing. *Id.* Ms. Desadier saw the man in the vehicle run over the man standing outside of the vehicle. Ms. Desadier "slammed on the brakes, went to the side of the road," and told her daughter to call 911. *Id.* Ms. Desadier jumped out of the vehicle and was running to Mr. Gillette to give him aid "when the gun shots went off." *Id.* Ms. Desadier hollered at a friend to secure the firearm and then went over to help Mr. Gillette. According to Ms. Desadier, Mr. Gillette "was more or less rolled over by the car." Ms. Desadier described Mr. Gillette's position as "by the driver's window." *Id.* at 132-33.

When asked if she was able to see Mr. Gillette clearly, Ms. Desadier answered, "Yes, sir." *Id.* at 134. Ms. Desadier stated that she saw Mr. Gillette's

hands and did not see anything in them.  When asked if she would have been able to see a gun or anything in the pedestrian's hands, Ms. Desadier replied, "Oh, yes, sir." *Id.* Ms. Desadier did see a knife in a sheath on Mr. Gillette's side.  As for the gunshots, Ms. Desadier could see that they were coming from Mr. Gillette, who was on the ground and who had just been struck by the vehicle.  *Id.* at 136.  Ms. Desadier further clarified the sequence of events as follows: "He was struck, and as he was going down, that's when the shots went off." *Id.*

On cross-examination, Ms. Desadier testified that the victim hit the defendant's windshield before he rolled off the hood.  *Id.* at 140.  When asked if the victim acted in a threatening manner, Ms. Desadier answered: "All I saw was the hands up, and - - and the men arguing." *Id.* Ms. Desadier further testified that Mr. Gillette had a gun in one sheath and a knife in the other.  When asked if she saw the white Mercedes go in reverse after the victim was struck, Ms. Desadier replied, "No."

Benjamin Nettles was taking his daughter to dance on the day in question, when he noticed two vehicles stopped in the "crossover." *Id.* at 146.  As he got closer, Mr. Nettles noticed "the first one was standing outside the vehicle and one was still in the vehicle." *Id.* at 147.  In Mr. Nettles's opinion, the person standing outside of the vehicle looked aggravated and obviously upset about something. *Id.* at 158.  When asked if he noticed whether this person had anything in his hands, Mr. Nettles answered, "Uh, I'm pretty sure there was something in his hand, now what it was, I - - I have no idea." *Id.* at 149.  The State then asked Mr. Nettles if he

14

would have been able to tell if the item was a firearm, and Mr. Nettles responded, "I don't think so, no, sir, not going at that . . . . that -- that speed . . . ." *Id.* at 150. On cross-examination, Mr. Nettles described Mr. Gillette's hands as being down while standing in front of the vehicle. On re-direct, Mr. Nettles stated that he was 80 to 90 percent sure the pedestrian had something in his hand. ECF No. 10-3 at 10.

According to Mr. Nettles, the pedestrian, Mr. Gillette, was standing in front of the other vehicle. Mr. Nettles did not stop since he had his daughter with him. After he passed the intersection, Mr. Nettles looked in his rearview mirror and saw Mr. Gillette get hit and pushed three or four feet. *Id.* at 150. After his daughter's dance class ended, Mr. Nettles drove back to the same area and saw police. Mr. Nettles stopped and told the police what he saw. ECF No. 10-3 at 3.

The victim's wife, Carolyn Gillette, was the next witness to testify. According to Mrs. Gillette, she and her husband were about to turn when they noticed a vehicle approaching very quickly from behind. Believing it was unsafe to turn, Mr. Gillette went across the median and pulled over. The vehicle, a white Mercedes, passed and then came back. *Id.* at 19. According to Mrs. Gillette, the Mercedes returned by putting his vehicle in reverse. Mrs. Gillette testified that the person in the Mercedes backed up directly next to her on the passenger's side:

> Q.    Okay. And -- and what happened at that point when he got window to window?
> A.    He was screaming and hollering that we didn't know how to drive, and driving to [sic] slowly in the left hand lane, just being, I mean, just ironic, just angry, he was mad, you know, and -- and I kind of got scared a little bit because I wasn't for sure what he was going to do, he was right there, you know, and uh, that's when Billy stepped out of the car.

*Id.* Mrs. Gillette testified that the driver, Ross, was yelling obscenities and was very upset with them. *Id.* at 23-24.

According to Mrs. Gillette, her husband was not "really upset" with Ross but was confused as to why Ross was so upset. *Id.* at 24. Mrs. Gillette testified that her husband got out of the car when she said that Ross was scaring her. Mr. Gillette walked to the back of his car, and Ross backed up. Mrs. Gillette could hear what was being said and could see what was happening through her rear-view mirror. *Id.* at 25. Mrs. Gillette described the ensuing events as follows:

> Q.    Okay. Do you recall any of the - - the verbal exchange, were you able to hear the conversation?
> A.    Well, uh, he was telling Billy again, no, no, that - - that lane is - - is 65 and, you know, he was going 40 and - - and that was crazy, and he was - - he was ranting and raving, the same stuff over and over, the - - the foul words, and Billy just told him, he said man, none of this is worth this, just - - just go on. Just go on home, go on about your business, you know, and he again- - he - - you're here threatening me, Billy is like what? No, I'm not threatening you.
> Q.    Okay.
> A.    You know, he says, well you're packing a gun, he said so.

*Id.* at 25-26.

Mrs. Gillette described Mr. Gillette's voice as raised when telling Ross to leave. According to Mrs. Gillette, Ross could have simply pulled forward to leave. *Id.*

Mrs. Gillette testified that she never saw Mr. Gillette try to get in Ross's car, make a step toward Ross's car, or otherwise threaten Ross. *Id.* at 34. Mrs. Gillette did, however, hear Ross threaten Mr. Gillette by stating, "I will kill you if you

threaten me." *Id.* at 36.  When asked if her husband was armed, Mrs. Gillette

replied that he always "open carried" a .357 Revolver, which was holstered.  Mrs.

Gillette testified that during the time Mr. Gillette was out of the vehicle, she never

saw a weapon in his hand.  *Id.* at 46.  He had one hand hanging and the other was

pointing north when speaking to Ross.  *Id.* at 29.  When asked what happened next,

Mrs. Gillette testified:

> A.   Well, all of sudden, I mean, just, I never - - I - - Billy told him to leave and Mr. Ross, I could see through my side mirror, was backing up, I - - I assumed, maybe he was getting our license plate number for whatever reason, he wanted it, I don't know, but, there was no reason for him to back up.
>
> Q.   Okay.
>
> A.   And when I realized why he was backing up, it was like, - - it was too late.
>
> Q.   Okay.
>
> A.   Billy tried to get out of the way but, he couldn't get out of the way fast enough, and then Billy just disappeared on me.
>
> Q.   Okay.
>
> A.   Just completely out of my view.
>
>        . . . .
>
> A.   . . .  And I thought he was under the car, I didn't know that he was being drug on the other side of the car.
>
> Q.   Okay.
>
> A.   Um, I thought that he was under the car, and I kept looking for him to come out from underneath the car, and then the - - the next thing I saw was, Billy was laying across the media [sic] on the other side of the highway, in the uh, little white ring thing right there.
>
> Q.   Okay.
>
> A.   And he was laying there, he wasn't moving, and it was uh, almost - - it was just like a tunnel vision for me, all I can do was see him laying there, and then I heard the guns go off - - the gun go off, and it was just like - - it - - it woke me up, and he was alive.
>
> Q.   Okay, did - - did you notice him drawing the gun or does - - is that something you - - he described to you, ...
>
> A.   No, . . .
>
> Q.   . . . . since then?

A.    . . . I - - I didn't - - I didn't see it, . . .
Q.    Okay.
A.    . . . I'm - - even though I was looking straight at him, it was just like - - it took that gun shot to - - to ...
Q.    Okay.
A.    . . . pull me out of that um, - - all I could - - all I was imaging [sic] was, he - - he was gone.

ECF NO. 10-3 at 31-32.

When asked what she did after she heard the gunshots, Mrs. Gillette replied that she got out of the car, and Ross was speeding off down the median.  ECF No. 10-3 at 33-34.  Mrs. Gillette estimated that Ross traveled about 50 to 60 yards before stopping.  *Id.* at 34.

Mrs. Gillette described her husband's injuries:

A.    I knew right off the bat, that he had a concussion, he had a huge knot on his head, some uh, lacerations on both arms, uh, his clothes were just all drug to pieces, and his foot, his leg was tangled, just it - - it was - - you could tell it was broken.

At the conclusion of her direct examination, Mrs. Gillette testified that even though Mr. Gillette did not threaten Ross, she assumed that Ross saw Mr. Gillette's holstered gun as a threat.  *Id.* at 35.  Mrs. Gillette reiterated that her husband's gun remained holstered the entire time.  *Id.*

On cross-examination, Mrs. Gillette explained that Mr. Gillette did not go into the turning lane to turn.  When he saw Ross's car quickly approaching, Mr. Gillette tapped on his brakes to let Ross know to pull over.  Mr. Gillette then pulled over, but Ross continued to travel a couple of car lengths before he backed up to the passenger's side of Mr. Gillette's car.  *Id.* at 37-38.  When Mr. Gillette got out of his vehicle, Ross backed up his car to speak to him.  According to Mrs. Gillette, her

husband and Ross were communicating right behind the Gillette's car.  On re-direct examination, Mrs. Gillette reiterated that just before he was struck by Ross's car, Mr. Gillette had no gun in his hand.  *Id.* at 46.

The final witness to testify for the state was the victim, Billy Gillette.  Mr. Gillette testified that his wife picked him up from work on the day in question. They stopped to get "a six pack" and were approaching an intersection to make a turn to go home when he noticed a vehicle approaching him "very fast."  ECF No. 10-3 at 49.  Instead of trying to make the turn, the Mr. Gillette got off the road and stopped.  Mr. Gillette described the vehicle approaching him as a silver or white Mercedes Benz SUV.  The Mercedes passed Mr. Gillette and then backed up to confront him.  *Id.* at 51-52.  When asked what happened next, Mr. Gillette testified:

> A.    He was raising all kind of cain, fussing at us, uh, I heard him say, I'll kill you, you SOB, dah, dah, dah, you don't need to be f-ing driving, this, that, and another. At that point, that's when I realized, I'm sitting here, my wife is between me and him.
> Q.    Okay.
> A.    All right? The only reason I got out of the vehicle was to get his - - his attention off her, I moved around back here.
> Q.    Okay, did he stay beside the vehicle?
> A.    No, sir, no. Soon as I came around here, he backed up.
>         . . . .
> A.    Yes, sir, but - - but when uh, when I got out of my car to go around the back, he apparently saw me because he - - he - - he backed up right here, and that's where we had our confrontation.

*Id.* at 53.

Mr. Gillette stated that he felt his wife was threatened and had no idea what Ross was capable of.  *Id.* at 54.  He did not know whether Ross was armed, but he heard the words "I'll kill you."  *Id.*  Mr. Gillette continued testifying:

19

Q.  All right, and so after you got out of the vehicle, and he backed up to where you last indicated his car was, uh, where did you go - - what - - how - - how - - where did you go from there?

A.  I got out of my vehicle, because he was still here, I got out of my vehicle and started walking this way, around the back, like I said getting his attention away from my wife, get her out of danger. He backed up at the same time and stopped right here, and I was probably six (6) feet from his vehicle.

Q.  Okay, and he had his window down, I'm assuming?

A.  Yes, he did.

Q.  Uh, in relation to the front of the side uh, where - - where in relation did his vehicle did you - - did you end up?

A.  I ended up about six (6) feet away from - - five (5) or six (6) feet away from his window, . . .

Q.  Okay.

A.  . . . facing him.

Q.  All right, so as you did that um, did you - - did you have any more words?

A.  Oh, yes, we had a few words.

Q.  Okay.

A.  Uh, about you - - uh, I didn't need to have a driver's license, uh, I was f–ing crazy, how uh, uh, you - - 65 here, uh, I tried to explain to the man that I'm making a turn here to go home, he had no - - he don't want to hear it, . . .

Q.  Right.

A.  . . . you know, and yeah, we - - we had a few uh, cuss words at each other, and I just - - I finally said, it's not worth all this, leave, and I pointed in that direction.

Q.  Okay.

A.  With my right hand, I said just leave, just go. He looked at me and as he shook his head like he agreed, okay, I said okay, this is over with. I began to back away from the vehicle, the whole time the gun was in the holster on my left side, . . .

Q.  Right.

A.  . . . I cross carry.

Q.  Right.

A.  All right? I'm backing up but I'm not - - I'm not turn [sic] my back on him, he proceeds to back up about thirty (30) feet, right in this area somewhere, I'm about right where this square is at the time. My door on my vehicle is open, all right? I'm heading back this way, I think he's either backing up to get my license plate number because he can't see it or he's leaving the scene.

Q.  Okay.

20

A.     Uh, he straightened his vehicle up like so, and before I knew it, he gassed it, hit me, I hit the front driver's side, as I recall, front driver's side, broke my leg, I hit the windshield, concussion. When I stopped rolling, I was right here.

Q.     Okay.

A.     So, I mean, he - - he dragged me - - he drug me, thirty (30) feet, whatever. When I got through rolling, I was right here on the side of the road. I went - - I kind of went out just for a couple of seconds, it was black, - - all I saw was sky, road, sky, road, sky road, then I remember me - - my leg hurting, and feeling pain in my head.

Q.     All right, where . . .

A.     I was wearing a - - I was wearing a cap and sunglasses, and the glo - - the sun glasses got destroyed. But uh, I was laying here, my head was this way, I was facing that way, looking at direction, laying on my side, on my right side like so. When I looked at Mr. Ross's vehicle, I saw taillights, and then I saw the white reverse lights, ...

Q.     Yes, sir.

A.     . . . and at that point, I said the man is trying - - he's making me good on his threat, he's going to try to back over me. He did the back up, and that's when I unholstered my weapon, and I fired three (3) shots in the back of his vehicle to change his mind, and he did. He then proceeded up in this way, he went down the road, it seemed a little bit further, he stopped right about up here.

Q.     Okay, right.

A.     And then - - then aft - - after - - that I was watching him because I thought he was going to be coming back, and all I could think of was, you know, I'm about to die, I'm about to die here, and uh, everything started going fuzzy after that, and the next thing I know, there's a first responder next to me telling me not to go to sleep, rolled me on my back, . . .

Q.     Okay.

A.     . . . you know, but uh, in that time period, I'll tell you this, in that time period when I was laying there, I was thinking to myself, nobody is going to come and help me if I have a pistol in my hand, so I reholstered my pistol, and threw it over in the grass.

ECF No. 10-3 at 55-57.

Mr. Gillette identified a photograph depicting the broken windshield of Ross's car.  Mr. Gillette testified that he saw the glass shatter "when the round hit." *Id.* at 59.  And the glass fell out when Ross's car was coming toward him. *Id.* at 61.  When asked if he could tell how fast the vehicle was traveling toward him, Mr. Gillette testified, "Uh, all I knew, he was coming back." *Id.*  He further testified that the reverse lights indicated the vehicle was coming back toward him.

Mr. Gillette further testified regarding his injuries:

A.    My right leg uh, had the fibula, the small bone broke in two (2) places. Uh, there's also a - - a fracture of the ankle. Abrasions and cuts to my knees and what have you. Uh, the left leg just had some abrasions and cuts, see that's, you know, my right leg there.

Q.    This is your right leg here?

A.    Yes, sir.

Q.    Can you tell me a little bit about what they had to do to repair your uh, your leg?

A.    Yes, sir, it required surgery, they had to put a titanium rod, a plate, and six (6) to eight (8) screws, I'm not sure exactly the number, in my right leg, uh, and now I'm - - I'm packing this metal - - plus I've got a scar about ten (10) or eleven (11) inches long on my leg.

ECF No. 62.  Mr. Gillette testified that his recovery was about eight weeks, and his leg bothers him every morning.  *Id.* at 62.

Finally, the State asked Mr. Gillette if he ever pulled his weapon out of his holster, and the following colloquy ensued:

A.    Sir, that never - - the weapon never left my holster until Mr. Ross had run me down, . . .

Q.    Okay.

A.    . . . and in my mind, was attempted [sic] to do it again, that's when I holster - - that gun was unholstered, used and then secured after he - - he had left the area supposedly.

22

Q.  Okay, um, you described for me the - - the event after you got struck by the car, and how far you traveled uh, and I'm assuming that was a very traumatic uh [sic], wasn't it?

A.  Yes, sir.

Q.  Um, would you have been able to hold on to that pistol if you had put it in your hand?

A.  No, sir, I don't see how I could have.

Q.  Okay.

. . . .

A.  I'm not saying it's impossible, but I can't see it.

Mr. Gillette identified Ross as the person that ran over him. *Id.* at 63.

On cross-examination, Mr. Gillette agreed that he was armed with a .357 Magnum and a knife when he exited his vehicle. He described the knife as a four-inch fixed blade used for cleaning his fingernails, cutting strap ties, and opening packages. *Id.* at 65. Mr. Gillette also agreed that the knife is sharp on both sides and could be used to stab someone, although it is not designed for that purpose. *Id.* When asked if he normally carried his gun on his person, Mr. Gillette replied, "Yes, sir, all the time." *Id.* at 66.

When asked if it was fair to say he was mad when he exited his vehicle, Mr. Gillette replied, "I was upset, yes, I was." *Id.* He agreed that it was an animated argument with cursing. *Id.* at 67. When defense counsel asked him if he put his hands on his weapon at any time, the victim replied, "Never." *Id.* According to Mr. Gillette, Ross hit him with the front driver's side of his vehicle. Mr. Gillette was standing "no closer than six (6) feet" from the driver's side of Ross's car but never touched it. After being hit, Mr. Gillette was disoriented for a few seconds. Defense counsel asked how soon Mr. Gillette fired his weapon after "waking up," and Mr. Gillette replied:

23

> A.    It's hard to say uh, I was laying on the side, kind of realized what was happening and I looked down, and I saw Mr. Ross's vehicle, brake lights and reverse lights on. I - - I'm going to say probably three (3) seconds, five (5) at the most, ...
>        . . . .
> Q.    And then you starting [sic] firing at the vehicle?
> A.    That's when I pulled my weapon and began fire, yes.

ECF No. 10-3 at 69-70.

On re-direct, the state asked Mr. Gillette why he did not shoot the front of the vehicle when Ross first hit him, and Mr. Gillette replied, "Because my weapon was still holstered on my right hand . . . . on my left-hand side." *Id.* at 71. When asked if he had time to get his weapon out, Mr. Gillette replied, "No way." *Id.*

Ross testified on his own behalf. On the day in question, Ross had received a shot for his back at Rapides General and was going to pick up a prescription when he was driving north on Highway 167. *Id.* at 75-76. Defense counsel asked Ross when he first saw the victim, and the following colloquy took place:

> A.    Uh, whenever I run up behind him, ...
> Q.    Okay.
> A.    . . . I got into uh, 55 mile per hour zone, just north of Creola, which is about probably half a mile from the store to where all this here was at. When I hit 165, I come - - I mean, uh, 65 . . .
> Q.    167 you mean?
> A.    . . . I mean, yeah, 167, I sped up to 65 or maybe a little over, ...
> Q.    Uh-huh (affirmative response).
> A.    . . . and uh, I passing an 18-wheeler on the right-hand side, and uh, when I got - - I got probably - - I don't know, probably about down here at the bottom of this picture down here, and I run up behind him, and uh, he was going pretty slow that day, . . .
> Q.    Okay.
> A.    . . . on the highway.
> Q.    What you do then?
> A.    Uh, when I couldn't get over, I went around the truck so I had - - I had to hit my brakes.
> Q.    Okay, and aft - - after you hit your brakes, what happened?

A.     Uh, about got run over by another truck behind me ...

Q.     Okay.

A.     . . . uh, but uh, I started slowing down and uh, Mr. Gillette was hitting his brakes all the way through here several times just, you know, hitting his brakes, looking back in his mirror at me, I could see him in the mirror because I was close to him. When the 18-wheeler passed me, I was going to get over and go around him . . .

Q.     Uh-huh (affirmative response).

A.     . . . but the green truck behind me, that almost hit me, he - - he shot around me, and when he did it was a tan car almost run into the back of me, too.

Q.     Okay.

A.     That I - - I - - I had . . .

Q.     Y'all were - - y'all - - y'all were almost at a stop at this point?

A.     Oh, yes, sir, yes, sir, uh - -

Q.     And - - and y'all were ...

A.     (Indistinct).

Q.     . . . y'all were in the lefthand lane on 167?

A.     We were up in here, there was a tan car coming around me because I - - I was watching it, trying - - trying to keep distance between running into him and keep the other car from hitting me, and it passed me about right in here.

Q.     Okay.

A.     And by then, I mean, Mr. Gillette was about stopped, and he come up there and turned in right here, right - - right - - at an angle, right in here.

Q.     Okay, now did Mr. Gillette ever use that turning lane at any time?

A.     No, sir, never once got in it.

Q.     Okay.

A.     And didn't ever have his blinker on either.

ECF No. 10-3 at 76-77.

Ross testified that he backed up because the victim and his wife were "sitting there looking at [him]." *Id.* at 78. He testified that Mr. Gillette exited his vehicle with a pistol in his hand and walked up to Ross's car door. *Id.* at 78. Ross further testified that his car was still in reverse when Mr. Gillette walked up to it. When asked if he had a chance to say anything to Mr. Gillette, Ross answered:

25

A.    No, sir, I didn't.

Q.    Okay.

A.    I couldn't say nothing.

Q.    Did he say anything to you?

A.    Yeah, he told me he was going to kill me, I don't know what I was doing, he ‑ ‑ I wasn't saying nothing, I ‑ ‑ I didn't want to move. I mean, I'm sitting there looking at a barrel ‑ ‑ like this, and uh, I couldn't move, he had both hands on his gun, with his hand out on me like that.

Q.    What did his face look like?

A.    He was red faced, uh, he was sweating.

Q.    Uh‑huh (affirmative response).

A.    He was uh, he was upset. I was looking dead in his eyes, I was looking down at that barrel, . . .

      . . . .

A.    He told me he was going to blow my mother f–ing brains out.

*Id.* at 79.

Ross testified that he backed up enough to where he could turn and hit Mr. Gillette to get away from him. *Id.* at 80. Ross then put his car in drive and ducked so the car would take any bullets. Ross testified:

A.    And uh, I gassed it, and laid down, and I turned the wheel to hit him, and when I hit him, he come up on the car.

Q.    Uh‑huh (affirmative response).

A.    I drove across the median, he was up on the car, and a woman hollered, there goes the windshield. I made a hard right, laying in the seat, I made a hard right, he fell off the car, right in here.

Q.    Uh‑huh (affirmative response).

A.    And I turned and went down the median, well when I ‑ ‑ when he rolled off, I stopped just for a second, raised up and looked at him, he was laying on his chest and his belly, laying down, his head was looking back toward the road.

Q.    Okay, and ‑ ‑ and ‑ ‑ and why ‑ ‑ why did you look at him?

A.    I wanted to see if he was all right, I didn't ‑ ‑ I didn't want to hurt the man, I was trying to get away from the gun, and uh, when I took off, I run over his back leg, I mean, his legs with my back tire on the car ‑ ‑ I felt it boom, boom, when I run over him.

Q.    Uh‑huh (affirmative response). And when ‑ ‑ when did you start getting shots fired at you?

> A.    As soon as I left the road, as soon as I left right here ‑ ‑ because I turn and went ‑ ‑ I turned and went down the shoulder of the road all the way ‑ ‑ I went a pretty good ways down there, because he was shooting. I looked in my mirror, I was laying down, I looked in my mirror, he was sitting up in the road shooting at me.
>
> Q.    Uh‑huh (affirmative response).
>
> A.    He had both hands on his gun.

Ross waited with his vehicle until the police arrived. *Id.* at 82. When asked if he meant to kill Mr. Gillette when he hit him, Ross responded, "Lord no, I wasn't trying to hurt nobody." *Id.* at 83.

On cross‑examination, the prosecutor asked if Ross backed up to tell Mr. Gillette how to drive. Ross answered, "No, sir, I backed up ‑ ‑ I backed up to tell him that there's a turning lane right here, and that's what it's for in that 65 miles an hour zone . . ." *Id.* at 88. Ross denied telling Officer James that he backed up to give Mr. Gillette a "piece of his mind." *Id.* at 89‑90. He also denied telling Mrs. Gillette anything when he backed up to her window. *Id.* at 94. Ross also stated that Mrs. Gillette got out of the car. *Id.* Although Mr. Gillette never attempted to get in Ross's car, he testified that Mr. Gillette had a gun on him and stated that he was going to kill Ross.

Ross and the prosecutor then had the following exchange about Ross's ability to move while Mr. Gillette allegedly had a gun pointed at him:

> Q.    Right, and so, my point is, when you said you couldn't move because you had a gun at your head ‑ ‑ a foot from your face, you moved at least twice after that. You went into reverse, you backed up your car. You pointed your car at him, and then you shifted gears, ...
>
> A.    Uh‑huh (affirmative response).
>
> Q.    . . . you said you undid your seatbelt, ...

A.    Uh-huh (affirmative response).
Q.    . . . and then you floored it.
A.    I laid it down, I laid it down and punched it.
Q.    And then ran over him.
A.    I hit him with my car.
Q.    Okay. So my - - my point is, you could move?
A.    Yeah, to get him - - to get him out of my way, yeah.
Q.    Okay.
A.    To get the gun out, yeah.
Q.    And are - - I guess, what would have been the difference between doing that and - - and driving down the road?
A.    Pulling out in front of traffic.
Q.    So there was traffic coming?
A.    Well it could have been, I couldn't look.

ECF No. 10-3 at 99-100.

Ross admitted he committed an aggravated battery against Mr. Gillette but claimed it was committed in self-defense. *Id.* at 102. He testified that, after initially hitting Mr. Gillette, he stopped to make sure Mr. Gillette was okay. He then "took off" without knowing Mr. Gillette's legs were still under his car. *Id.*

The state re-called Detective James on rebuttal. Detective James testified that Ross said at the scene that he backed up to give Mr. Gillette "a piece of his mind." Ross also told Detective James that Mr. Gillette had his gun drawn and that Ross would have gotten shot if he had not acted. *Id.* at 108-09. According to Detective James, Ross did not tell him that Mr. Gillette threatened to shoot him. Detective James recounted that Ross told him he ran over Mr. Gillette because he was afraid Mr. Gillette would kill him. *Id.*

On appeal, Ross argued that the testimony of Thomas, who saw Ross making his way through traffic in a non-aggressive manner; Mr. Nettles, who saw something in Mr. Gillette's hand; and Ms. Desadier, who said that shots were fired

as Mr. Gillette was going down, establishes that Mr. Gillette was armed before Ross ran him over. Additionally, Ross argued that his actions were justified because Mr. Gillette was carrying a firearm and a knife; Mrs. Gillette assumed that Ross was threatened by the weapons her husband was carrying; Ross was reasonable in fearing for his safety even if the gun was holstered; and Mr. Gillette was the aggressor who approached Ross. Thus, Ross claims his actions were justified and prove he did not have specific intent to kill Mr. Gillette.

As the appellate court noted, Ross testified that he backed up his vehicle so he could run over Mr. Gillette rather than leave the scene. ECF No. 10-3 at 80, 99-100 ("And uh, I backed up enough where I could turn and hit him to get away from him."). He stated: "I gassed it, and laid down, and I turned the wheel to hit him. . . ." *Id.* at 80. Furthermore, Mr. Gillette and Ms. Perrine both testified that Ross began backing up after he hit Mr. Gillette the first time. This testimony plus the testimony of Mr. and Mrs. Gillette that Ross threatened to kill Mr. Gillette is sufficient for a rational juror to infer the defendant specifically intended to kill the victim. The jury believed the testimony of the Gillettes and Detective James over that of Ross. Those credibility determinations are beyond the scope of federal habeas review.

Thus, in summary, Ross cannot show that the state court's decision rejecting his insufficient evidence claim was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States.

**D.** <u>**Ross is not entitled to habeas relief on his claim of an improper jury instruction.**</u>

Ross contends the trial court improperly instructed the jury that he bore the burden of proof as to his justification defense. Generally, the submission of improper jury instructions in a state criminal trial is not a basis for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991). In examining habeas claims of improper jury instructions, the "inquiry is not whether there was prejudice to the [petitioner], or whether state law was violated, but whether there was prejudice of constitutional magnitude." *Sullivan v. Blackburn*, 804 F.2d 885, 887 (5th Cir. 1986).

The trial court gave the following instruction: "Defendant has argued that he acted in self-defense. To establish such a defense in a non-homicide case, the defendant has the burden of proving by a preponderance of the evidence that the use of force was justified." *Ross,* 269 So.3d at 1073. Ross's attorney objected because there was a split in the circuits about with whom the burden of proof lies. The trial court overruled the objection. The appellate court noted that "[t]his circuit has repeatedly held that the burden of proving self-defense in a non-homicide case rests with the defendant to prove the defense by a preponderance of the evidence." *Id.* at 1074. It further reasoned that, even when an improper burden of proof may have been imposed, the conviction will be upheld when the record supports a finding that the defendant did not act in self-defense. *Id.* (citing *State v. Heider*, (La. App. 3 Cir. 10/3/12), 101 So.3d 1025).

Ross has not established that the instruction was substantively incorrect or that the instruction offends the federal constitution. A state does not violate a defendant's due process rights when it allocates to the defendant the burden of proving an affirmative defense where that defense merely excuses conduct that would otherwise be punishable. *See Smith v. U.S.*, 133 S.Ct. 714, 719 (2013); *Martin v. Ohio*, 107 S.Ct. 1098 (1987).

Because the state court adjudicated this claim on the merits, habeas relief is available only if the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d). Ross has not identified any Supreme Court decision that obligated the trial judge to give a different instruction regarding the burden with respect to self-defense.

### E.    Ross's claim regarding the denial of Motion for New Trial is not viable under § 2254.

Ross's argument that the trial court erred when it denied his motion for a new trial does not involve a question of federal or constitutional law. Review of that claim is thus not proper under § 2254. *Haygood v. Quarterman*, 239 F. App'x 39, 42 (5th Cir. 2007) (*citing Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir. 1991)) (state court's denial of a motion for a new trial does not necessarily constitute a violation of a federal constitutional right). A federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding," and instead is limited to review of

31

questions of federal constitutional dimensions. *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994); *Armstead v. Deville*, 2019 WL 10734570, at *9 (E.D. La. 2019), *report and recommendation adopted*, 2020 WL 5752244.

**F.    Ross cannot establish ineffective assistance of counsel.**

Ross alleges that he received ineffective assistance of counsel through his attorney's performance at trial and sentencing.[1]    The "Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Missouri v. Frye*, 566 U.S. 134, 140 (2012) (citing *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009)).    To establish ineffective assistance of trial counsel, a petitioner must show that counsel rendered deficient performance which resulted in actual prejudice. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984).

Federal habeas review of a state court's denial of an ineffective-assistance-of-counsel claim is "doubly deferential."    That is, the federal court must look at counsel's performance through the deferential lens of § 2254(d).    And the reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Rector v. Johnson*, 120 F.3d 551, 563 (5th Cir. 1997), *cert. denied*, 522 U.S. 1120 (1998).

The prejudice prong requires a showing that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

---

[1] Ross lists seven claims of ineffective assistance of counsel in his memorandum, but he only addresses four of those claims.  ECF No. 5 at 22-33.

would have been different." *Strickland*, at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

### 1. <u>Failure to call witnesses.</u>

Ross alleges that his attorney provided ineffective assistance by "failing to call crucial witnesses that could have testified in his defense." ECF No. 5 at 23. Specifically, Ross asserts that his attorney should have called Detective Kyle Martin, Sheila Green, Joey Dubea, and Willis White. ECF No. 5 at 23-26.

"Complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what a witness would have testified are largely speculative." *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986) (citing *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984)); *see also Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983) (citing *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)). To show ineffective assistance of counsel in the context of an uncalled witness, a movant must: (1) name the witness he would have called; (2) show the witness would have been available to testify; (3) show the witness would have testified; and (4) show there is a reasonable probability the witness would have provided testimony that would have made a difference in the outcome of the trial. *See Bray v. Quarterman*, 265 F. App'x 296, 298 (5th Cir. 2008) (per curiam) (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)); *see also Gomez v. McKaskle*, 734 F.2d 1107, 1109-10 (5th Cir. 1984) (petitioner failed to meet his burden of showing that uncalled witnesses would have testified favorably to his case). When "the only

evidence of a missing witnesses' [sic] testimony is from the [movant], this Court views the claims of ineffective assistance with great caution." *Sayre v. Anderson*, 238 F.3d 631, 636 (5th Cir. 2001) (quoting *Lockhart*, 782 F.2d at 1282). Generally, when a movant fails to present at least some evidence from an uncalled witness regarding the witness's potential testimony and willingness to testify, it is fatal to an ineffective assistance of counsel claim. *See Harrison v. Quarterman*, 496 F.3d 419, 428 (5th Cir. 2007); *see also Sayre*, 238 F.3d at 636.

Ross alleges that Detective Martin informed him that a witness named Sheila Green took a video of the "entire incident" and the video would be obtained. ECF No. 5 at 24. He further alleges that Sheila Green was available for trial and lives a short distance from the courthouse. *Id.* Ross concludes that the alleged video and testimony of Sheila Green and Detective Martin would have led to a verdict of not guilty. *Id.* However, Ross presents no evidence to substantiate his claims. *See, e.g., Cox v. Stephens*, 602 F. App'x 141, 146 (5th Cir. 2015) (rejecting claim that counsel was ineffective for failing to call witnesses at trial because petitioner "failed, through affidavits or otherwise, to demonstrate that these witnesses would have testified; identify the content of their testimony; or support that their testimony would have been favorable"); *Anthony v. Cain*, No. 07-CV-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); *Combs v. United States*, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844,

at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); *Harris v. Director, TDCJ-CID*, No. 6:06-cv-490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").

Moreover, at the post-conviction hearing, Detective Martin testified that he did not speak to any witnesses at the scene or take any statements. ECF No. 10-10 at 65. Specifically, Detective Martin testified that he did not speak to Shelia Green, and he was unaware of any videos of the incident. *Id.* Ross's attorney testified that he spoke with Ms. Green, who stated that she did not witness the incident and did not possess a video recording. ECF No. 10-10 at 53.

Next, Ross alleges that his attorney should have called witness Joey Dubea because he took the gun from Mr. Gillette. ECF No. 5 at 25. Ross claims that Mr. Dubea was available for trial and lives a short distance from the courthouse. *Id.* Ross asserts that Mr. Dubea would have testified that Mr. Gillette got out of his vehicle brandishing his gun. *Id.* Once again, this claim is unsupported by an affidavit or statement from Joey Dubea. And the record contains testimony presented at the post-conviction hearing that Joey Dubea came upon the incident after the gunshots were fired. *Id.* at 91.

Finally, Ross alleges that his attorney should have called Willis White as a witness. Ross claims that Mr. White would testify that he saw Mr. Gillette with

something in his hand prior to being struck by Ross's vehicle.  Again, this claim is conclusory and unsupported.

Ross cannot establish a reasonable probability that these witnesses would have provided testimony that would have made a difference in the outcome of the trial.  Nor has he shown that the state courts' determination was contrary to, or was an unreasonable application of, federal law.

### 2.    Failure to ensure a fair sentencing hearing.

Ross complains that his attorney failed to obtain his medical and mental health records for sentencing and failed to call an expert witness on Ross's behalf. ECF No. 5 at 27-28.  At sentencing, Ross's attorney called Rose Beason, Nila Painter, and Roy Ross as witnesses.  ECF No. 10-4 at 28.  Ross's friend Rose Beason testified that Ross took medication for back pain and for schizophrenia.  *Id.* at 33. Ross's sister, Nila Painter, testified that Ross suffers from paranoid schizophrenia. *Id.* at 35.    Ross's son, Roy, testified that his father suffers from paranoid schizophrenia and bipolar disorder.  *Id.* at 43.

The trial judge noted Ross's history of mental illness, including anger issues, schizophrenia, and bipolar disorder, as well as his history of a back injury requiring pain management.   ECF No. 10-4 at 55.  Ross has not shown how medical records or expert testimony would have affected the result of the sentencing.  Ross makes only conclusory allegations of prejudice.

The state appellate court noted:

Relator does not allege anything specific about the nature of his medical condition, what the medical records would have established, or

> how the medical records or an expert witness would have affected the result of sentencing. Relator simply makes conclusory allegations. Relator has failed to demonstrate how the inclusion of his medical history or calling an expert would have resulted in a reasonable probability that the sentence would have been different.

ECF No. 10-10 at 123. Ross cannot establish that the state court unreasonably applied *Strickland.*

Ross also asserts that his attorney failed to object to hearsay testimony at sentencing, and that the trial court improperly relied on that testimony. However, as the state court noted, the rules of evidence do not apply to sentencing hearings except in capital cases. ECF No. 10-10 at 123. And a sentencing court may consider sources of information that would normally be excluded from trial. *Id.* Ross's attorney called witnesses to testify on Ross's behalf at sentencing. On cross-examination, the State elicited testimony regarding Ross's anger issues and prior bad acts. Ross claims that his attorney should have objected. However, "by calling theses witnesses, [Ross] opened the door for the State to inquire into this line of questioning." ECF No. 10-10 at 123. Such objections would have been overruled. The failure to raise meritless motions or to make meritless objections does not result in the ineffective assistance of counsel. *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990).

Finally, Ross alleges he was deprived of the opportunity to testify at sentencing. Ross's son was called as a witness. He indicated that his father suffers from anger issues. Testimony was elicited indicating that Ross had previously threatened to retrieve a gun from his car to "take care of" some doctors. ECF No.

10-4 at 56. Ross addressed his son at the conclusion of testimony, stating: "It's okay son, I ain't guilty. I ain't guilty by no means. Because what I done was done in self-defense. I just didn't have no witnesses, except the lady with the video, so." ECF No. 10-4 at 45. Ross interjected comments to his son but did not express a desire to testify.

Regardless, the right to allocution is not a right granted or protected by the federal constitution, and its denial presents no cognizable federal habeas issue. *See United States v. Reyna*, 358 F.3d 344, 349 (5th Cir. 2004) ("[T]he right of allocution is deeply rooted in our legal tradition and an important, highly respected right; nonetheless it is neither constitutional nor jurisdictional.").

Ross does not present evidence showing that his testimony would have resulted in a more favorable sentence. He has failed to show, as required by § 2254(d), that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Moreover, Ross has failed to overcome the doubly deferential standards that must be accorded to his trial attorney considering both Strickland and § 2254(d). *See Harrington v. Richter*, 562 U.S. 86, 105 (2011).

G.    <u>Ross fails to state a habeas claim regarding allegedly prejudicial remarks by the judge.</u>

Ross alleges that the trial judge made prejudicial comments about Ross's lack of remorse and threats of violence toward witnesses.   ECF No. 5 at 32.  The judge's comment about a lack of remorse was a statement of his own observation made during the imposition of sentence.  It was not a comment made to a witness or juror. The judge never discussed any threats of violence by Ross.  Rather, it was Ross's son and sister who testified that Ross previously threatened to pull a gun on his doctor (ECF No. 10-4 at 56) and maintains a list of people he is going to "take care of" or harm when he is released from jail (ECF No. 10-4 at 39).  Ross's due process claim is unsupported by the record.  He fails to meet his burden under § 2254(d).

H.   <u>Self-defense in non-homicide cases</u>

Ross alleges that his due process rights were violated "when the trial judge refused to look at the First and Fourth Circuit's views on self-defense in a non-homicide case."  ECF No. 5 at 33.  This claim was essentially addressed in the context of Ross's claim regarding the allegedly improper jury instruction.  The appellate court noted that "[t]his circuit has repeatedly held that the burden of proving self-defense in a non-homicide case rests with the defendant to prove the defense by a preponderance of the evidence."  *Id.* at 1074.  It further reasoned that, even when an improper burden of proof may have been imposed, the conviction will be upheld when the record supports a finding that the defendant did not act in self-defense.  *Id.* (citing *State v. Heider*, (La. App. 3 Cir. 10/3/12), 101 So.3d 1025).

Ross does not show that the state court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

## III. <u>Conclusion</u>

Because Ross cannot establish his right to habeas relief under § 2254, IT IS RECOMMENDED that the Petition (ECF No. 1) be DENIED and DISMISSED WITH PREJUDICE.

Under 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), a party may file written objections to this Report and Recommendation within 14 days of service, unless the Court grants an extension of time to file objections under Fed. R. Civ. P. 6(b). A party may also respond to another party's objections to this Report and Recommendation within 14 days of service of those objections, again unless the Court grants an extension of time to file a response to objections.

No other briefs may be filed without leave of court, which will only be granted for good cause. A party's failure to timely file written objections to this Report and Recommendation will bar a party from later challenging factual or legal conclusions adopted by the District Judge, except if the challenge asserts "plain error."

Pursuant to Rule 11(a) of the Rules Governing Section 2254 cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. Within fourteen (14) days from service of this Report

and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue. *See* 28 U.S.C. § 2253(c)(2). A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.

SIGNED on Thursday, September 21, 2023

_____
JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE